No. 25-1671

_____

**In the United States Court of Appeals**
**FOR THE SEVENTH CIRCUIT**

**CHARLES SEELOW and CITY OF MILWAUKEE,**
**DEFENDANTS-APPELLANTS**

**v.**

**ROXANNE SCHLENDER,**
**PLAINTIFF-APPELLEE**

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin, the Honorable
Nancy Joseph, United States Magistrate Judge, Presiding
Case No. 2:23-cv-0329,

_____

**DEFENDANTS-APPELLANTS' BRIEF AND**
**REQUIRED SHORT APPENDIX**

_____

EVAN GOYKE
City Attorney

Clint B. Muche
Assistant City Attorney for the City of Milwaukee
State Bar No. 1131629
Attorneys for Defendants-Appellants

<u>Milwaukee City Attorney's Office</u>
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8550

# DISCLOSURE STATEMENT

In accordance with Circuit Rule 26.1, the Defendants-Appellants Charles Seelow and City of Milwaukee submit the following:

(1)    The full name of every party that the attorney represents in the case: Charles Seelow, City of Milwaukee

(2)    The names of all law firms whose partners or associates have appeared for the parties in the case or are expected to appear for the parties in this court: MILWAUKEE CITY ATTORNEY'S OFFICE, EVAN C. GOYKE, CITY ATTORNEY, represented by Assistant City Attorney Clint B. Muche.

(3)    If the party to amicus is a corporation:

i)    Identify all its parent corporations, if any: Not applicable.

ii)    List any publicly held company that owns 10% or more of the parties' or amicus' stock: Not applicable.

(4)    Attorney's signature: Date: November 21st, 2025

s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
Wisconsin State Bar No. 1131629

Please indicate whether you are *Counsel of Record* for the above-listed parties pursuant to Circuit Rule 3(d): Yes.

Address:    200 East Wells Street
City Hall 800
Milwaukee, WI 53202
Tel: 414-286-2601
Fax: 414-286-8550
Email: cmuche@milwaukee.gov

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ........................................................... iv-vi

STATEMENT ON ORAL ARGUMENT ................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES.......................................................... 3

STATEMENT OF THE CASE.............................................................. 4

    **A. Casino staff became concerned about Schlender's behavior.** ................. 5

    **B. Seelow seized and began relocating Schlender.** ............................... 6

    **C. Seelow decentralized Schlender to subdue her.** ............................... 9

    **D. Schlender and Seelow received medical attention, Schlender was criminally charged and convicted, and she made prior statements.** ...... 11

    **E. Schlender brought the present lawsuit.** ....................................... 11

SUMMARY OF ARGUMENT ............................................................. 13

STANDARD OF REVIEW ................................................................. 17

ARGUMENT ................................................................................... 17

    I. **It Was Not Objectively Unreasonable to Believe It Was Necessary and Lawful to Escort Schlender With Her Arm Behind and Across Her Back.** .................................................................................. 18

        A. <u>Compliance Techniques Involving Physical Discomfort May Be Arguably Reasonable Under the Fourth Amendment.</u> ................ 20

    B. Whether Schlender Asked to be Released Or Promised to Walk Does Not Change the Legal Analysis. .........................................................................25

II. **It Was Not Objectively Unreasonable to Believe It Was Necessary and Lawful to Decentralize Schlender to Subdue Her.** ...................................28

    A. Stopping, Turning Around, and Attempting Arguably Constitute Resistance—Or At Least Do Not Convey Submission. ...........................29

    B. It Was Not Clearly Established in March 2017 That A Takedown Was Disproportionate to Even Mild Resistance. ..............................................33

CONCLUSION .......................................................................................................37

CERTIFICATION OF SERVICE............................................................................38

CIRCUIT RULE 30(D) CERTIFICATE .................................................................39

CERTIFICATE OF COMPLIANCE .......................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Abbott v. Sangamon County*, 705 F.3d 706 (7th Cir. 2013) .................14, 18, 25, 27

*Barnes v. Felix*, 605 U.S. 73 (2025) .......................................................................24

*Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016)........................................21, 23, 24

*Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2003) ............................................................29

*Brooks v. City of Aurora*, 653 F.3d 478 (7th Cir. 2011)
........................................................................... 15, 21-25, 27, 29, 30, 31, 32, 37

*Cyrus v. Mukwonago*, 624 F.3d 856 (7th Cir. 2010) ...............................................21

*Day v. Wooten*, 947 F.3d 453 (7th Cir. 2020)..........................................................17

*Daza v. Indiana*, 941 F.3d 303 (7th Cir. 2019)..........................................................4

*Deering v. Reich*, 183 F.3d 645 (7th Cir. 1999) ...........................................3, 20, 28

*Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) .....................13, 17, 29, 33, 36

*Flowers v. Renfro*, 46 F.4th 631 (7th Cir. 2022) .....................................................17

*Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013) .................................. 15, 22-24

*Gant v. Hartman*, 924 F.3d 445 (7th Cir. 2019) .....................................................17

*Graham v. Connor*, 490 U.S. 386 (1989) ...............................................................21

*Gupta v. Melloh*, 19 F.4th 990 (7th Cir. 2021) ................................. 3, 15, 28, 36-37

*Gutierrez v. Kermon*, 722 F.3d 1003 (7th Cir. 2013) .............................................17

*Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018) ..........................7, 15, 22, 25, 33

*Johnson v. Rogers*, 944 F.3d 966 (7th Cir. 2019)...............................3, 15-16, 32-37

iv

*Jones v. Clark*, 630 F.3d 677 (7th Cir. 2011) ...........................................................2

*King v. Hendricks Cnty. Commissioners*, 954 F.3d 981 (7th Cir. 2020)..................4

*McGee v. Parsano*, 55 F.4th 563 (7th Cir. 2022) ....................................................2

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................2

*Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978) ..............1

*Pearson v. Callahan*, 555 U.S. 223 (2009)..........................................................4, 20

*Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2022) ........................ 21-22, 29

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)...............................................................2

*Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019) ............................................17

*Scott v. Harris*, 550 U.S. 372 (2007) .....................................................................23

*Silva v. Wisconsin*, 917 F.3d 546 (7th Cir. 2019) ....................................................4

*Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021) ........................................... 25-27, 37

*Snukis v. Taylor*, 145 F.4th 734 (7th Cir. 2025) ....................................................21

*Stewardson v. Biggs*, 43 F.4th 732 (7th Cir. 2022)................................................17

*Tennessee v. Garner*, 471 U.S. 1 (1985)................................................................26

*Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020).................19, 23, 28, 33

## Federal and Relevant State Rules

28 U.S.C. § 1291 ......................................................................................................2

28 U.S.C. § 1331 ......................................................................................................1

28 U.S.C. § 1343 ...................................................................................1

28 U.S.C. § 1367 ...................................................................................2

Circuit Rule 26.1 ....................................................................................i

Circuit Rule 30 ....................................................................................39

Circuit Rule 32 ....................................................................................40

Fed. R. App. P. 32 ..............................................................................40

Fed. R. App. P. 34 ................................................................................1

42 U.S.C. §1983 ....................................................................................1

# STATEMENT ON ORAL ARGUMENT

Defendants-Appellees believe that oral argument is necessary unless the Court finds that the dispositive issues have been authoritatively decided, rendering oral argument unnecessary per Fed. R. App. P. 34(a)(2).

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant Roxanne Schlender (Schlender) filed suit in the Eastern District of Wisconsin against Charles Seelow (Seelow), City of Milwaukee, and Edward Flynn (collectively, the City Defendants) alleging that they violated her federal civil rights pursuant to 42 U.S.C. § 1983. (R. 1)[1]. Schlender alleged that Seelow restrained her without reasonable suspicion, used excessive force first by putting her in a "painful arm bar" and then when he decentralized her, and that he "fabricated grounds for criminal charges" against her. (R. 1, §§ 33-37). Plaintiff also raised *Monell*[2] claims against Flynn, in his official capacity as then-chief of the Milwaukee Police Department, and against the City. The district court had subject-matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343. Schlender also raised claims under state law, for bodily injury (against Seelow) and for indemnification and under *respondeat superior* (against the City), arising from the

---

[1] Citations to the record on appeal are to "R." followed by the district court docket number, and (where appropriate) a page number. Citations to the short appendix are to "SA" followed by the page number. Citations to documents filed in this appeal are to "ECF No." followed by the Seventh Circuit docket number.

[2] *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

1

same events. (R. 1). The district court had subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367. The parties consented to entry of final judgment by a magistrate judge: Plaintiff's written consent was filed March 29, 2023, *see* R. 8, and the City Defendants consented in writing on April 14, 2023. (R. 11).

On August 8, 2024, the parties filed a joint stipulation for partial dismissal and limited consent to entry of judgment providing that the City of Milwaukee agrees to entry of judgment against the City for compensatory damages if any City employee violated Plaintiff's constitutional rights as pleaded in Plaintiff's complaint. (R. 23). The City has an on-going stake in this appeal for that reason. On December 17, 2024, the District Court denied Defendants' motion for summary judgment based on qualified immunity as to Plaintiff's excessive force claim. (R. 39; SA 1-23). Defendants timely filed a motion to reconsider, *see* R. 42, and notice of appeal on April 21, 2025. (R. 47). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 over the denial of qualified immunity under the collateral order doctrine when the question presented is one of law, either because the facts are undisputed or the appellant has taken each disputed fact in the light most favorable to the non-movant. *See, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *McGee v. Parsano*, 55 F.4th 563, 572 (7th Cir. 2022); *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011).

## STATEMENT OF THE ISSUES

The district court denied Seelow qualified immunity at summary judgment based upon the "existence of material factual disputes" because the video evidence "is fairly open to varying interpretations." (R. 39, at 18, 20; SA 18, 20). The district court should have separately analyzed the two uses of force (i.e., the escort hold and the takedown) that Schlender alleged were excessive. *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999).

The district court additionally noted that the video "does not fully corroborate either party's version of events." (R. 46, 5). It should have asked instead whether, in light of the video, Schlender could establish a version of events that would defeat summary judgment. *See Johnson v. Rogers*, 944 F.3d 966, 969-70 (7th Cir. 2019); *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021). Furthermore, the district court should have asked whether it clearly established in March 2017 that using minimal force to relocate an uncooperative detainee was plainly unlawful.

The district court held that the video evidence plausibly shows that Schlender was cooperating immediately before the takedown. It does not. The video dispels any genuine dispute that Schlender was under control just prior to the takedown. The district court should have granted Seelow summary judgment based on qualified immunity as to the takedown because Seelow could have reasonably believed taking Schlender to the ground to subdue her was lawful under the circumstances depicted.

Each of these issues turn upon questions of law, rather than fact. Thus, the issue on appeal is whether Seelow is entitled to qualified immunity from this suit. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Because qualified immunity is an immunity from suit rather than a mere defense to liability … it is effectively lost if a case is erroneously permitted to go to trial.") (internal quotations and citation omitted).

## STATEMENT OF THE CASE

To the extent that the relevant facts are disputed, the Court must view those facts in the non-movant's favor. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). "But this does not extend to drawing inferences that are supported by only speculation and conjecture." *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019) (internal quotations and citation omitted). This Court may reverse the district court's decision at summary judgment upon any ground supported by the record, if raised before the district court. *Silva v. Wisconsin*, 917 F.3d 546, 558 (7th Cir. 2019).

The appellee, Roxanne Schlender, claims her civil rights were violated and that she sustained injuries at the Potawatomi Bingo Casino (Casino) on March 13, 2017. (R. 1). She sued Seelow individually for actions taken under color of law on that occasion. (R. 1). The City has stipulated to entry of judgment against itself in the event Seelow is ultimately found liable to Schlender. (R. 23).

## A. Casino staff became concerned about Schlender's behavior.

Schlender was a patron at Casino. (R. 39, 1; SA 1). Although the Casino is privately operated, Milwaukee police officers, like Seelow, perform law enforcement duties at the venue. (*Id.*). The Casino also employs a private security staff and maintains a private security department. (*Id.*). The venue is monitored by overhead security cameras; the parties obtained seven surveillance videos related to the incident. (*Id.*).[3] The following events are largely captured by video. (R. 39, 3-5; SA 3-5).

Around 9:30 p.m., Security Stand-in Supervisor Alex Traylor (Traylor) went to a restroom regarding an intoxicated patron later identified as Schlender. (R, 39, 3-4; SA 3-4). Security officers Jocelyn Mason (Mason) and Nikki Martin (Martin) arrived shortly thereafter. (R. 39, 4; SA 4). Mason entered the women's bathroom at 9:36 p.m. (*Id.*). Around 9:40 p.m., another Casino employee briefly left and then returned with a wheelchair. (*Id.*). Martin then arrived and took the wheelchair into the bathroom. (*Id.*). At 9:46 p.m., Schlender was wheeled out of the bathroom seated in the wheelchair. (R. 39, 5; SA 5).

---

[3] The City Defendants filed these surveillance videos with the district court as R. 29-1. The video files were separately filed on a USB drive with an accompanying letter, *see* R. 30, and separate instructions. (R. 31). The USB drive, docketed as Ex. A to R. 29, contains a total of eight (8) video files, as well as the viewer application. In addition, the video files contained on the USB drive, Ex. A, are identified by filename in *Declaration of Clint B. Muche in Support of Defendants' Motion for Summary Judgment*. (R. 29).

About ten seconds after being brought out of the bathroom, Schlender got up out of the chair and walked to a walkway next to the Casino floor, before sitting down in front of a gaming machine where she remained for about two minutes. (R. 39, 5-6; SA 5-6). At 9:52 p.m., Schlender got up from the machine and began walking with Casino staff before abruptly taking off running onto the Casino floor. (R. 39, 6; SA 6). At this point, Traylor contacted Seelow because he felt he was "losing control of the situation" and Schlender was refusing to leave. (*Id.*).

## B. Seelow seized and began relocating Schlender.

Seelow testified that he received a radio request for assistance with an intoxicated patron running through the venue. (*Id.*, at 7). The district court reviewed a video recording tagged "4902 Pit 8 Walkway PTZ." (R. 29-1 ("Pit Walkway camera")).[4] The video shows Schlender crouching behind some machines, before running to where she first encountered Seelow. (*Id.* at 9:53:55-57). Seelow had his hand raised in a "stop" position as Schlender approached. (*Id.*). As (*Id.*). Seelow testified that Schlender appeared to be highly intoxicated, and that he intended to escort her to a holding room temporarily. (*Id.*). The district court found that when Schlender kept walking Seelow took hold of her left arm, that she tried to pull free and kicked at him several times, and that when Seelow tried to lead Schlender forward along the walkway she "briefly" planted her feet refusing to move. (*Id.* at 7,

_____

[4] The video recording natively tagged as "4902 Pit 8 Walkway PTZ" is contained on the USB drive, Ex. A, as "01 SCHLENDER 9_53_52 to 9_54_57 PIT 8 WALKWAY.pef."

17-18). However, the district court's account of the video is incomplete—it settles substantially more than that. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video evidence firmly settles a factual issue, there is no genuine dispute about it[.]").

The video depicts Schlender approaching Seelow, who is in the extreme foreground with his left hand raised palm out towards her. (R. 39, 7; SA 7; *see also* Pit Walkway Camera, 9:53:57). Then Seelow put a hand on Schlender's back and took a hold of her left arm. (R. 39, 7; SA 7; *see also* Pit Walkway Camera, 9:53-58). Schlender "[tried] to pull her arm free from his grasp and kick[ed] him several times." (R. 39, 7; SA 7; *see also* Pit Walkway Camera, 9:53:58-9:54:13). Over the next five seconds, Seelow maneuvered Schlender forward and repositioned himself behind her with her left arm behind her back. (Pit Walkway Camera, 9:54:13-18). When Seelow moved forward Schlender stopped walking, pulling away again. (*Id.*, 9:54:19-21). Seelow repositioned himself on Schlender's left and started forward again, but she did not move forward with him. (*Id.*, 9:54:22-23). Seelow was beside and slightly behind Schlender holding her left arm with both hands when they began moving forward again. (*Id.*). A group passed, then Schlender turned right—away from Seelow—towards the tables next to the walkway. (*Id.*, 9:54:24-26). For a few seconds Schlender moved forward with Seelow offset and behind her grasping her left arm. (*Id.*, 9:54:26-33). Then Schlender slowed, turning towards Seelow, before

Seelow guided her towards the middle of the walkway, falling in more directly behind her. (*Id.*, 9:54:33-37). As the district court found, Schlender and Seelow pass out of view of the Pit Walkway camera at approximately 9:54:50 p.m. (R. 39, 17; SA 17; *see also* Pit Walkway Camera).

At 9:54:46 p.m., Schlender's head appears in the view of a video recording tagged "4762 TT13-14-15-16." (R. 29-1 ("Slots camera")).[5] Both Schlender and Seelow are fully in view of the Slots camera by 9:54:49 p.m. (*Id.*, 9:54:44-49). Seelow is behind Schlender holding her left arm across her back. (*Id.*). For the remainder of this view, Schlender and Seelow walk away from the camera as they approach the column in the shot's background. (*Id.*, 9:54:50-9:55:07).

Schlender testified that she could not recall her initial encounter with Seelow. (R. 39, 7; SA 7). Her blood alcohol content was later found to be 0.213—more than twice the legal limit to drive in Wisconsin. (R. 39, 13; SA 13). Traylor testified that Schlender was verbally resisting and trying to break free from Seelow. (*Id.*). Martin testified that Schlender did not want to leave the Casino. (R. 39, 8; SA 8). She said that after Schlender tried to break free Seelow changed his hold. (*Id.*). The video shows that Seelow moved behind Schlender, maintaining control of her left arm behind her back. (*See* Pit Walkway Camera, 9:54:33-37). And, as the district court

---

[5] The video recording natively tagged as "4762 TT13-14-15-16" is contained on the USB drive, Ex. A, as "02 SCHLENDER 9_54_44 to 9_55_28 TT 4762.pef."

noted, "Schlender testified that … after she took off 'the next thing [she knew]' was that someone was 'holding me from behind walking behind me down the long hallway.'" (R. 39, 7; SA 7).

## C. Seelow decentralized Schlender to subdue her.

The district court found that Schlender walked with Seelow controlling her from behind for approximately 30 seconds—with Traylor, Martin, and other Casino staff walking along with them—and that as the group neared a column, Schlender stopped moving forward, turned away from Seelow, then moved backwards towards him. (R. 39, 8-9; SA 8-9). Another camera showed a thick-heeled shoe moving backwards (i.e., towards Seelow), followed by Schlender and Seelow going down to the ground. (R. 39, 8; SA 8).

Again, the video evidence speaks for itself. A camera tagged "4904 TT Slots Pit 8 PTZ" captured the incident from a vantage point above and behind. (R. 29-1 ("Slots Pit Camera")).[6] At 9:54:49 p.m., the Slots Pit camera focuses on the group. The video shows that Schlender stopped moving forward and her body turned to her left (i.e., away from Seelow) perpendicular to the walkway. (*Id.,* 9:55:01-02). Then, she and Seelow moved backwards (i.e., towards the right side of the walkway). (*Id.,* 9:55:02-03). Next, Schlender moved to her left (i.e., back the direction she came

---

[6] The video recording natively tagged as "4904 TT SLOTS PIT 8 PTZ" is contained on the USB drive, Ex. A, as "P02 SCHLENDER 9_54_40 to 10_01_56 PIT 8 SLOTS.pef."

from) while Seelow maintained his position before Schlender was brought back in front of him again facing the entrance. (*Id.,* 9:55:03-05). Finally, Schlender's head dipped forward and away from Seelow as she begins stumbling to her right. (*Id.*, 9:55:06-08).

Another camera, tagged "0905 Roulette 1 PTZ (93137)," presents a closer view from behind a gaming table to the right of the walkway on the other side of the column. (R. 29-1 ("Roulette Camera").[7] At 9:55:06.53, Schlender's leg was bent 90 degrees at the knee and extended backwards towards Seelow. Then Schlender took several small steps away from Seelow, who maintains control of her left arm, before falling in a circular fashion and striking her head on the base of the column. (Roulette Camera, 9:55:06-08). Finally, a camera tagged "4703 TT PTZ" is positioned in front of the column. (R. 29-1 ("Camera 4703")).[8] Schlender and Seelow appear on the far right side, next to the column, at 9:55:06 p.m. (*Id.*). In the video, Schlender takes several small to her right before she goes to the ground. (*Id.*, 9:55:06-08).

The district court noted that Schlender testified that Seelow caused "[her] whole left side of [her] body" to lift off the ground, then forcefully tried to push her down, and that she never tried to kick Seelow or break free from him. (R. 39, 8; SA

---

[7] The video recording natively tagged as "0905 Roulette 1 PTZ (93137)" is contained on the USB drive, Ex. A, as "P03 SCHLENDER 9_54_22 to 10_01_06 ROULETTE.pef."

[8] The video recording natively tagged as "4703 TT PTZ" is contained on the USB drive, Ex. A, as "03 SCHLENDER 9_55_02 to 10_01_20 TT 4703.pef."

8). The video evidence contradicts Schlender's story that she never tried to break free from Seelow and that Seelow lifted her off the ground. *See* Slots Pit Camera, 9:55:06-08; Roulette Camera, 9:55:06-08; Camera 4703, 9:55:06-08.

**D. Schlender and Seelow received medical attention, Schlender was criminally charged and convicted, and she made prior statements.**

Schlender sustained a cut above her right eye and was transported for medical attention. (R. 39, 9; SA 9). Her medical records state that she was "acutely intoxicated" and that she "does not know where she is or what happened prior to her arriving at the hospital." (R. 39, 13; SA 13). Her blood alcohol content was more than two times the legal limit to drive in Wisconsin after the incident (*Id.*). Schlender testified "that she could not remember her initial encounter with [Seelow]." (R. 39, 7; SA 7). "[A]fter she took off [running from security] 'the next thing [she knew] was that someone was 'holding me from behind walking behind me down a long hallway.'" (*Id.*). Seelow's medical records reflect that his left shin was bruised. (R. 39, 16; SA 16). It is undisputed that Schlender was criminally charged, found guilty of disorderly conduct, and sentenced to time-served. (R. 24, § 21-22).

**E. Schlender brought the present lawsuit.**

On March 10, 2023, Schlender, by and through counsel, filed a complaint in the district court asserting claims against Seelow, City of Milwaukee, and Edward Flynn (Flynn), in his official capacity as (former) chief of the Milwaukee Police Department. (R. 1). Plaintiff's complaint raised multiple claims: she alleged that

Seelow restrained her without reasonable suspicion, and that he used excessive force by putting her in a "painful arm bar without cause or justification," and when he decentralized her. (R. 1, §§ 33-35). Plaintiff additionally alleged that Seelow "fabricated grounds for criminal charges. (R. 1, § 37). Schlender additionally brought *Monell* claims against Flynn and the City under federal law, and state law claims for bodily injury (against Seelow), and vicarious liability and indemnification (against the City). (R. 1).

Prior to summary judgment, the parties stipulated to partial dismissal and limited consent to entry of judgment. (R. 23). In essence, Plaintiff dismissed the fabrication-of-evidence claim and her claim against Flynn as well as the state law claims and the City agreed to entry of judgment against itself in the event Seelow were ultimately found liable to her. On July 8, 2024, the parties filed a joint statement of undisputed facts (R. 24). Then the City Defendants moved for summary judgment on the merits and, in the alternative, based on qualified immunity. (R. 26-29).

Schlender opposed the defendants' motion emphasizing that Schlender denies that she kicked Seelow and that "without the 'kick' [Seelow] had no legitimate basis to … take her to the ground." (R. 34, 2). Her motion in opposition argued that: Seelow had no grounds to detain her at the outset, *see* R. 34, 11-12; that her resistance was "justified" under the circumstances, *see id*., 12-13; and that summary

judgment is "foreclosed" in any event because she denies that she kicked him. (R. 34, 13).

On December 17, 2024, the district court issued an order granting in part and denying in part the City Defendants' motion for summary judgment. (R. 39, 22-23; SA 22-23). The court held that "[t]he existence of material disputes about the circumstances … precludes a ruling on qualified immunity at this juncture." (R. 39, 20; SA 20).

## SUMMARY OF ARGUMENT

"[T]his appeal raises a pure legal question," because the video evidence "clearly depicts [Schlender's] physical resistance." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). Seelow lawfully seized Schlender for disorderly conduct in a public space with others nearby. (R. 39, 2-14; SA 2-14). She physically resisted his initial efforts to relocate her. (*Id.*). During the encounter, Seelow changed to an "escort hold" controlling Schlender's left arm behind and across her back. (*Id.*, 39, 8; SA 8). Schlender cooperated for a time. (*Id.*). But after she stopped moving forward again, Seelow decentralized her to the ground. (R., 39, 8-9; SA 8-9). Schlender claimed that both the escort hold <u>and</u> the takedown constituted excessive force. (R., 39, 15; SA 15).

In denying Seelow qualified immunity as to the excessive force claim the district court found that summary judgment was precluded by material questions

about whether Seelow used "pain compliance" while escorting her; whether Schlender asked Seelow to "please let her go … to [just walk];" whether Seelow "tugged [her] so hard that [her] whole left side of [her] body kind of came off [the ground;]" whether Seelow "forcefully tried to push [her] down … to the ground;" and whether Schlender kicked Seelow. But even if these supposed jury questions resolve in Schlender's favor, qualified immunity still applies.

To overcome qualified immunity, a plaintiff must establish that "it was objectively unreasonable for the officer to believe that the force [employed] was lawful." *Abbott v. Sangamon County*, 705 F.3d 706, 724-25 (7th Cir. 2013). This Court should reverse the district court's order denying Seelow summary judgment based on qualified immunity because existing precedents in March 2017 did not clearly establish that using an escort hold to control an uncooperative detainee was plainly unlawful or that using a takedown to subdue an uncooperative detainee was plainly unlawful.

Schlender asserts that when Seelow moved behind her maintaining control of her left arm she felt "pain and discomfort," *see* R. 1, § 22, that caused her "to move to relieve the pressure." (R. 1, § 23). The district court implicitly held that a genuine factual dispute about whether this minimal force was warranted under the circumstances precluded summary judgment based on qualified immunity, *see* R. 39, 18-20; SA 18-20, because the video evidence "does not fully corroborate either

party's version of events." (R. 46, 5; SA 28). The district court should have asked whether Schlender could establish a version of events that would defeat summary judgment in light of the video. *See Johnson*, 944 F.3d at 969-70; *Gupta*, 19 F.4th at 997.

The video firmly settles that Schlender did more than passively resist Seelow's initial efforts to relocate her. *Horton*, 883 F.3d at 944. In *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013), arm-bar holds and wrist lock techniques were characterized as "minimally forceful." *Brooks v. City of Aurora*, 653 F.3d 478, 487 (7th Cir. 2011), held that "it would not have been obvious to a reasonable police officer in [the defendant-officer's] position that the application of pepper spray [to an arrestee who had not submitted] was unlawful." Even in the light most favorable to Schlender, the video dispels any genuine dispute that Schlender had submitted before Seelow changed to the escort hold. This Court should reverse the district court's order denying summary judgment for Seelow based on qualified immunity as to the escort hold. Presuming that Schlender "promised that she would 'just walk'" the legal analysis is unchanged. (R. 39, 15; SA 15). Prior cases recognize that cooperative words may be undercut by uncooperative actions. *Brooks*, 653 F.3d at 487. At minimum, it would not have been plainly obvious to a reasonable officer in Seelow's shoes that he was required to take her words at face value.

Schlender seeks to link the escort hold and the takedown together; she claims that the hold caused "pain and discomfort" which caused her "to move to relieve the pressure." (R. 1, §§ 22-23). Essentially, she asserts her physical resistance cannot justify the takedown because she was privileged to resist. (*Id.*, § 33). The district court held that the video plausibly shows that "just prior to [the takedown], [Schlender] was cooperating with [Seelow]." (R. 46, 5; SA 28). Although the video depicts a period of cooperation, it also shows Schlender stopped cooperating again before the takedown. *See* Slots Pit Camera, 9:54:46-9:55:06. Moreover, Schlender functionally concedes that she ***did resist*** the escort hold.

The *Johnson* Court observed that "[m]any decisions hold that there is no clearly established rule forbidding a clean takedown to end mild resistance." 944 F.3d at 969. Though the video did not clearly depict what precisely occurred, the defendant-officer was entitled to qualified immunity because it did show that prior to the takedown the detainee "was *not* under control." *Id.*, at 970. So too here. Even if the video does not "fully corroborate either party's version of events," *see* R. 46, 5; SA 28, it dispels any genuine dispute that Schlender was submissive, compliant, or under control immediately before the takedown. Under the circumstances, Seelow could have reasonably (even if mistakenly) believed that taking Schlender to the ground to subdue her was not plainly unlawful. Because prior cases had not clearly

established the unlawfulness of a takedown in such circumstances, the district court should have granted summary judgment for Seelow based on qualified immunity.

## STANDARD OF REVIEW

On appeal, the Court reviews *de novo* the denial of summary judgment based on qualified immunity. *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020). The trial court's denial of qualified immunity can only be appealed to the extent it turns on an issue of law. *Flowers v. Renfro*, 46 F.4th 631, 634 (7th Cir. 2022); *Stewardson v. Biggs*, 43 F.4th 732, 735 (7th Cir. 2022). As such, the appellant's argument "must accept the facts and reasonable inferences favorable to the plaintiff or the facts assumed by the district court's decision." *Gant v. Hartman*, 924 F.3d 445, 449, (7th Cir. 2019). *See also Rainsberger v. Benner*, 913 F.3d 640, 643 (7th Cir. 2019) ("[A]n officer can obtain interlocutory review only if he refrains from contesting any fact that a reasonable jury could resolve against him.") Nonetheless, the Court of Appeals may consider "whether a given set of undisputed facts demonstrates a violation of clearly established law." *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013).

## ARGUMENT

Excessive force cases are measured against the standard of objective reasonableness. *Dockery*, 911 F.3d at 463. Whether a particular use of force was reasonable presents a question of law, rather than fact. *Id.*, at 464. Qualified immunity applies not only to reasonable mistakes about what the law allows, but

also to reasonable mistakes about the circumstances presented because qualified immunity "affords enhanced deference to officers' on-scene judgments about the level of necessary force." *Abbott*, 705 F.3d at 724-25. Even if a plaintiff shows that excessive force was used, they must "further establish that it was ***objectively unreasonable*** for the officer to believe that the force was lawful" to overcome qualified immunity. *Id.* (emphasis added). Because the supposed jury questions identified by the district court are immaterial to the issue of qualified immunity, this Court should reverse the district court's order denying Seelow summary judgment.

## I.    It Was Not Objectively Unreasonable to Believe It Was Necessary and Lawful to Escort Schlender With Her Arm Behind and Across Her Back.

The district court correctly concluded that there was probable cause to seize and relocate Schlender from the Casino floor because she was engaging in disorderly conduct. (R. 39, 12; SA 12). The district court found that Schlender was "highly intoxicated" during the encounter; that Seelow was called for a patron "'running through the casino' and refusing to listen to security staff;" that the videos showed Schlender appearing to hide and run; and that when she first encountered Seelow she kept walking "[d]espite him raising his hand in a 'stop' position[.]" (R. 39, 12-14; SA 12-14).

The district court additionally found that as soon as Seelow impeded Schlender's movement, she physically resisted his efforts to control her: Schlender tried to "pull .. free from his grasp," and kicked at him—and when Seelow began to

lead her forward she "plant[ed] her feet." (R. 39, 7; SA 7). Traylor's and Martin's testimony that Schlender was verbally resisting, did not want to leave, and that Seelow changed his hold <u>after</u> Schlender was trying to pull away is undisputed because Schlender cannot recall the initial interaction with Seelow. (R. 39, 7-8; SA 7-8).

Despite these findings, the district court determined that questions of fact precluded summary judgment based on qualified immunity. At least insomuch as Schlender's claim arises from the "escort hold," *see* R. 1, §§ 22-23, there are no genuine issues of material fact which preclude summary judgment. Whether it was objectively unreasonable for Seelow to believe that Schlender posed a continuing risk of flight and/or other erratic behavior is not a jury question because it is undisputed Seelow changed his hold in response to Schlender's resistance. *Compare* R. 39, 7; SA 7 (Schlender could recall only that "someone was 'holding me from behind walking behind me.'"), *with* R. 39, 8; SA 8 (Martin testified Seelow changed his hold after Schlender tried to pull away). Whether the force he used was objectively unreasonable under the circumstances is similarly not a jury question. *Turner v. City of Champaign*, 979 F.3d 563, 565 (7th Cir. 2020) ("The central question is not whether officers used best police practices but whether [Seelow violated Schlender's] rights."). Furthermore, whether it was settled "beyond debate" in March 2017 that escorting an intoxicated and disorderly patron from a public

space by holding their arm across their back and directing them from behind was unlawful is not a jury question.

Courts should resolve questions of qualified immunity "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231. Although the district court allowed that Seelow may be entitled qualified immunity <u>after</u> trial, there are no additional disputed facts which preclude summary judgment for Seelow or which could overcome qualified immunity if proven at trial. As such, this Court should reverse the district court's denial of summary judgment based on qualified immunity. *Id.*

## A. Compliance Techniques Involving Physical Discomfort May Be Arguably Reasonable Within the Meaning of the Fourth Amendment.

Schlender claims that Seelow "twisted [her] arm behind her back into an arm bar, which caused her pain and discomfort," *see* R. 1, § 22; that this was done "without cause or justification," *see id.*, § 33, and that because of her discomfort she attempted "to move to relieve the pressure." (*Id.*, § 23). Discrete uses of force warrant separate analysis and justification. *Deering*, 183 F.3d at 652. Thus, the first question presented is whether it was objectively unreasonable for Seelow to believe that escorting Schlender as he did was lawful—that is, whether prior cases had "clearly established" that controlling an unruly detainee while relocating them from one area to another in that way was plainly unlawful in March 2017. *Abbott*, 705 F.3d at 724-25.

In essence, Schlender asserts that when Seelow moved behind her while maintaining control of her wrist he impermissibly "escalated to pain compliance." (R. 39, 15; SA 15). "Pain compliance techniques" are tactics used by law enforcement to control or subdue detainees through physical discomfort. *See generally Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 522 (7th Cir. 2012) (categorizing "pain compliance techniques" as less-than-lethal force). However, the Fourth Amendment's reasonableness standard demands only that the force used is not greater than necessary under the circumstances. *See, e.g., Snukis v. Taylor*, 145 F.4th 734, 741 (7th Cir. 2025) (finding less-than-lethal force in response to active resistance was not objectively unreasonable); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (holding force proportional to the circumstances presented is reasonable).

"Pain compliance" is not a constitutional standard—officers may lawfully use force, including force that causes physical discomfort and pain, in appropriate circumstances. *See, e.g., Graham v. Connor*, 490 U.S. 386, 396 (1989) (noting authority to seize entails "the right to use some degree of physical coercion … to effect it."); *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) (noting flight or the risk of flight justifies greater force); *Brooks*, 653 F.3d at 487 (observing that "whether and how much force is reasonable … can change as the situation develops."). In *Brooks*, using pepper spray to subdue an arrestee was not objectively

reasonable because the suspect "had not submitted." 911 F.3d at 487. The physical discomfort and pain caused by an across-the-back arm-hold is, at worst, on par with pepper spray: each involves temporary, if acute, physical discomfort. *See generally Phillips*, 678 F.3d at 522 (likening pepper spray to pain compliance techniques).

The video evidence firmly settles that Schlender did more than passively resist initial efforts to relocate her. *Horton*, 883 F.3d at 944. In *Fitzgerald*, the defendant-officers "grabbed [the plaintiff] by the arms" and "forcibly" put her on a gurney against her will. 707 F.3d at 734. The plaintiff resisted; she was "pulling her arms away, "screaming at the top of her lungs" and "trying to fight [them]" in response. *Id.*. The defendant-officers used "arm bar" and "wrist lock" techniques to control her breaking her wrist in the process *Id.* But, the court described these techniques as "minimally forceful" and found them to be objectively reasonable under the circumstances. *Id*. Based on *Fitzgerald*, a reasonable officer might believe that an arm bar is a lesser degree of force than pepper spray—and thus is proportional to something less than active resistance. In light of *Fitzgerald* and *Brooks*, it was (at least) arguably reasonable (i.e., not objectively unreasonable) to believe that the hold was lawful.

The circumstances captured by video in this case are not subject to genuine dispute: Seelow initially controlled Schlender's left arm at the wrist and elbow and she struggled, trying to pull away from him and kicking at him. *See* Pit Walkway

Camera, 9:53:57-9:54:37. Prior cases did not establish that using an arm bar hold was clearly unlawful under the circumstances—if anything *Fitzgerald* and *Brooks* suggest the opposite.

Although the district court found only that Schlender "briefly" planted her feet, *see* R. 39, 7, 17-18; SA 7, 17-18, courts must "[view] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378-81, 127 S. Ct. 1769 (2007). Taken in the light most favorable to Schlender, the video dispels any genuine dispute that she had submitted before he positioned himself behind her with her arm across her back and blatantly contradicts that Seelow moved her arm across her back in a uniquely aggressive or forceful manner. *See* Pit Walkway Camera, 9:53:57-9:54:37.

Prior cases have held that escalating force may be justified in response to continuing resistance and that pain compliance techniques, like pepper spray and arm-bar holds, are lawful when a detainee has not submitted, poses a risk of flight, and/or actively resists. *See, e.g., Turner*, 979 F.3d at 569 (citation omitted); *Becker*, 821 F.3d at 928; *Brooks*, 911 F.3d 487. Even taken in the light most favorable to Schlender, the video evidence depicts (at least) arguable grounds for Seelow to believe Schlender had not submitted and continued to resist. *See* Pit Walkway Camera, 9:53:57-9:54:37.

The Supreme Court recently emphasized that the totality of the circumstances—not merely the moments immediately preceding the use of force—bear upon the reasonableness of that conduct. *Barnes v. Felix*, 605 U.S. 73 (2025). Schlender's conduct is but one piece of the totality of the circumstances. The setting is another. Seelow first encountered Schlender on the gaming floor and intended to relocate her to a holding room. (R. 39, 7; SA 7). Other patrons can be seen using the walkway and at nearby gaming tables nearby. *See* Pit Walkway Camera, 9:53:57-9:54:37. Seelow knew that Schlender had run from security and walked past him when he tried to stop her—and there was probable cause to believe that she was causing a disturbance. (R. 39, 7, 14; SA 7, 14). She struggled to break free from his grasp, demonstrated a willingness to use violence against him personally to do so, and did not move with him as he guided her forward. *See* Pit Walkway Camera, 9:53:57-9:54:37.

The video leaves no genuine dispute that Schlender had not submitted to this point and posed a continuing risk of flight or further resistance. *See, e.g., Becker*, 821 F.3d at 928; *Brooks*, 911 F.3d 487; *Fitzgerald*, 707 F.3d at 734. Based upon the undisputed facts, Seelow had reason to believe that controlling Schlender was necessary for his and others' safety, to minimize the disruption and disturbance of others, and to further assess her needs. Even if the hold he employed not the least uncomfortable way to do so, the Fourth Amendment does not require the least

forceful or restrictive means. *Horton*, 883 F.3d at 950 (noting that the availability of less severe alternatives does not necessarily render a particular use of force unconstitutional). Moreover, qualified immunity provides "enhanced deference" for officers' in-the-moment judgments about how much force is required. *Abbott*, 705 F.3d at 724-25. This Court should reverse the district court's denial of summary judgment for Seelow based on qualified immunity because Schlender cannot show it clearly established in March 2017 that escorting her in this manner was plainly unlawful. *Id.*

## B. Whether Schlender Asked Seelow to Release Her or Promised to Walk With Him Does Not Change the Legal Analysis.

The district court highlighted Schlender's testimony that she asked Seelow to "'please let [her] go' and promised that she was 'just walk,'" *see* R. 39, 15; SA 15, and that she was "trying to leave the Casino and was cooperating with [Seelow.]" (R., 19; SA 19). There is no evidence—beyond speculation and conjecture—that this message was ever conveyed because Schlender does not recall what transpired before she was walking with Seelow behind her and her arm behind her back. (R. 39, 8; SA 8). Nonetheless, presuming that she did does not change the outcome on qualified immunity because her recorded actions "readily could be construed to belie [her] words." *Brooks*, 653 F.3d at 486.

In denying the City Defendants' motion to reconsider, the district court identified *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021) as instructive. (R. 46, 3-4;

25

SA 26-27). There, officers encountered a potentially armed suspect who did not follow commands. *Smith*, 10 F.4th 739. A stand-off ensued and officers, believing that the plaintiff was reaching for a firearm, used deadly force to subdue him. *Id.*, at 740. On appeal from the denial of summary judgment, the court held that before "qualified immunity can be decided … factual disputes as to how much of a threat Smith posed and how actively he was resisting must be resolved." *Id*. at 742. The district court held that this case was not ripe for summary judgment on the same basis. (R. 46, 5; SA 28).

Even in *Smith*, the Court of Appeals recognized that video evidence may resolve some ostensible factual disputes. 10 F.4th at 737. There, the court held that video evidence blatantly contradicted the plaintiff's story about whether he complied with orders and how he approached the officers. *Id.* So too here: the video evidence firmly settles <u>both</u> that Schlender struggled to break free from Seelow and kicked at him at the outset, <u>and</u> that she did not submit to his efforts to lead her off the gaming floor until he changed his hold positioning himself directly behind her. *See* Pit Walkway Camera, 9:53:57-9:54:37.

Moreover, this case is distinguishable from *Smith* because Seelow inarguably did not use deadly force. In *Smith*, the deadly force used was excessive unless probable cause existed to believe that the plaintiff posed a threat of serious physical harm to the defendant-officers or others. *Id*., at 736 (citing *Tennessee v. Garner*, 471

U.S. 1, 11 (1985). A different legal standard applies here: Seelow is entitled to qualified immunity <u>unless</u> it would have been obvious to a reasonable officer in his position that the escort hold was not lawful. *See, e.g., Abbott*, 705 F.3d at 724-25; *Brooks*, 653 F.3d at 487. Unlike *Smith*, this case turns upon a legal question which does not depend upon additional findings of fact.

This case is more like *Brooks.* In that case, the court presumed that the plaintiff had "communicated his willingness to submit to arrest," but nonetheless held that using pepper spray to subdue him would not have been obviously unlawful to a reasonable officer in the defendant-officer's shoes. *Brooks*, 653 F.3d at 487. Assuming Schlender did say she would walk on her own if Seelow let her go, the legal analysis remains unchanged. Like in *Brooks*, it was not plainly obvious that Seelow was constitutionally required to accept her promise as true (or to risk that it would prove false) given the undisputed facts to that point. Neither plaintiff, nor the district court have identified any cases standing for the proposition that a person is entitled to demand an alternative means of relocation once he or she has been taken into custody for disorderly conduct. For good reason: no such cases exist.

It is true that the parties' testimony paints two different versions of events. (R. 46, 5; SA 28). The question at summary judgment is not simply whether the video evidence "fully corroborates either party's version of events," but whether taking the record evidence in the light most favorable to the non-movant (i.e., Schlender) she

could plausibly establish a version of events on which she would prevail. *Gupta*, 19 F.4th at 997. The district court should have granted summary judgment for Seelow as to the escort hold because there is no plausible version of events on which Schlender can overcome qualified immunity. For this reason, this Court should reverse the district court's order denying summary judgment as to the escort hold.

## II. It Was Not Objectively Unreasonable to Believe It Was Necessary and Lawful to Decentralize Schlender to Subdue Her.

Although separate uses of force are legally distinct, plaintiff in this case seeks to link them together. *Deering*, 183 F.3d at 652. As discussed *supra*, Schlender claims that the escort hold (i.e., guiding her forward with her left arm behind and across her back) caused discomfort and pain which caused her to "move to relieve the pressure." (R. 1, § 23). According to Schlender, Seelow decentralized her in response to this movement. (*Id.*, § 24). Thus, Schlender implicitly asserts that because the hold was "without cause or justification" that she was privileged to move away from it (i.e. resist). (*Id.*, § 33). In essence, Schlender asserts that the resistance she offered to being escorted in the manner Seelow chose did not provide grounds to decentralize her.

This is a legal issue, not a factual dispute. (*Id.*, § 38). Detainees do not possess a privilege to negotiate alternative means of detention, or to physically resist detentions that they deem uncomfortable, embarrassing, or more restrictive than necessary. *See generally Turner*, 979 F.3d at 565 ("The central question is not

28

whether officers used best police practices[.]"). Schlender's assertion to the contrary presents a legal issue—not a question of fact for the jury—because a constitutional tort is *not* a direct analog to civil negligence. *Phillips*, 678 F.3d at 520. In excessive force cases, courts defer to the jury's factual determination of what happened, but must independently apply those facts to the law. *Id*. (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) (holding objective reasonableness is a legal determination)). Presuming that Schlender felt the hold was uncomfortable and unwarranted and for that reason she struggled against it, the legal question presented is whether an officer in Seelow's position could have reasonably construed her conduct as resistance. *Dockery*, 911 F.3d at 463. The district court should have granted summary judgment for Seelow as to the takedown because Schlender admits she resisted the escort hold, and prior cases did not clearly establish that taking a physically resistant suspect to the ground is plainly unlawful.

### A. Stopping, Turning Around, And Attempting to Pull Away Arguably Constitute Resistance—Or At Least Do Not Convey Submission.

As previously noted, greater force may be warranted as a situation develops. *Brooks*, 653 F.3d at 487. The district court found that the video plausibly shows that "just prior to [the takedown], [Schlender] was cooperating with [Seelow]." (R. 46, 5; SA 28). However, that depends on the meaning of "just prior."

The City Defendants do not dispute that the video depicts that Schlender was cooperative between 9:54:46 and 9:55:01 p.m., or that that period of time happened

after her initial resistance captured by the Pit Walkway Camera. *See* Slots Camera; Slots Pit Camera. However, the video additionally shows that "just prior" to the takedown Schlender stops moving forward as before. Her body turns to the left facing perpendicular to the walkway, *see* Slots Pit Camera, 9:55:01-02; then she moves backwards, *see id.*, 9:55:02-03; and turns away further to her left (i.e., back the direction from which she came)—before she is redirected to face the initial direction. (*See id.*, 9:55:03-05). While it is true that the video depicts a period of cooperation, "just prior" to the takedown Schlender was not cooperating. *See* Slots Pit Camera, 9:55:01-9:55:06.

The district court posits that this depiction could be consistent with Schlender's testimony that she asked to be released and promised to walk on her own. (R. 46, 5; SA 28). So it might be; the question is what legal significance attaches to a detainee's offer to negotiate an alternative means of egress.

In *Brooks*, an officer went to the plaintiff's house and informed him he was under arrest. 653 F.3d at 481. In response, the plaintiff (Brooks) stated "that he would go with [the defendant-officer] but first he wanted to [talk to his wife.]" *Id.* Then, he backpedaled away from the defendant-officer who pursued him. *Id*. The remainder of their interaction is captured by video: initially Brooks is backpedaling and apparently batting away the officer's hands, then he stops sticking his arms out in a "T," before lowering them to stomach level. *Id*. The defendant-officer holds a

pepper spray canister in his right hand with his left hand extended towards the plaintiff's chest. *Id*. Then, he fires a burst into Brook's face and four seconds later applies a second burst. *Id.*

On appeal, this Court held that a reasonable officer could have believed that Brooks was resisting arrest. *Id*. at 486. The *Brooks* Court additionally held that the defendant-officer could have reasonably believed Brooks' actions belied his stated willingness to cooperate. *Id*. at 487. Brooks claimed that by the time the defendant-officer administered the pepper spray he had ceased backtracking "therefore [the pepper spray] was not needed to effect his arrest." But the court did not reach this question, holding instead that "[w]e need not decide [that] because we believe that it would not have been obvious to a reasonable police officer in [the defendant-officer's] position that the application of pepper spray was unlawful." *Id.*

Presuming, as one must, that Schlender stated that she would cooperate the present case is not unlike *Brooks.* Seelow ordered Schlender to walk the path towards the entrance. He tried to take physical control of her evincing his authority, which she initially resisted. For some time Seelow maintained physical control and Schlender was outwardly cooperative—but then Schlender requested an alternative course of action and became physically resistant again.

The *Brooks* Court held that prior precedents "would not have communicated to a reasonable officer the illegality of applying pepper spray to an arrestee who has

ceased active, physical resistance for a couple of seconds but has not submitted to the officer's authority, has not been taken into custody and still arguably could pose a threat of flight or further resistance." *Id*. To the extent the present circumstances are distinguishable from *Brooks*, the differences do not help the plaintiff. Schlender cooperated for more than a few seconds, but still equally posed a risk of flight or further resistance. While Brooks was standing passively facing officers, Schlender was physically turning away from Seelow. Furthermore, unlike in *Brooks*, Schlender was not yet handcuffed. That she sought to negotiate an alternative itself is evidence she had not submitted to Seelow's authority. Finally, a takedown may be a lawful, proportionate response to "mild resistance" whereas some cases suggest only active resistance justifies the use of pepper spray. *Compare Johnson*, 944 F.3d at 969 ("[T]here is no clearly established rule forbidding a clean takedown to end mild resistance[.]"), *with Brooks*, 653 F.3d at 486 ("Courts often have held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest).

In short, even if factual disputes about the extent of Schlender's resistance or how much of a threat she posed preclude judgment on the merits the available video evidence provides sufficient detail to resolve the question of qualified immunity at summary judgment as discussed in greater detail below. Alternatively, Schlender functionally (if not literally) has conceded that she resisted the escort hold to relieve her discomfort. (R. 1, § 23).

**B. It Was Not Clearly Established in March 2017 That A Takedown Was Disproportionate to Even Mild Resistance.**

This Court should reverse the district court's order denying summary judgment as to the takedown because (a) prior cases do not plainly establish that takedowns are objectively unreasonable in response to mild physical resistance, (b) the video evidence firmly settles that Schlender physically resisted the escort hold, and (c) she does not assert otherwise. As such, there are no genuine disputes of material fact which preclude summary judgment based on qualified immunity.

The availability of less severe alternatives does not necessarily render a particular use of force unconstitutional. *Horton*, 883 F.3d at 950. Police policies and best practices do not define what is reasonable under the Fourth Amendment. *Turner*, 979 F.3d at 568. Moreover, whether a suspect intended to resist is irrelevant—what matters is how a reasonable officer would construe the circumstances. *Dockery*, 911 F.3d at 463.

In 2019, the *Johnson* Court denied that any clearly established rule prohibited taking a suspect to the ground to end "mild resistance." 944 F.3d at 969 (collecting cases). *Johnson* is instructive here not only because its reasoning depends upon cases decided before March 2017, but also because this Court held that the particularized right Schlender must show was clearly established to overcome qualified immunity was not clearly established nearly two years after the events of this case. Furthermore, *Johnson*—like this case—involves greater injury than normally

expected from a takedown. *Id*. ("Any takedown can go awry … but … injury does not lead to liability."). And, finally, the outcome turned upon video evidence. *Id.*, at 969-970.

In that case, the plaintiff (Johnson) showed up drunk for an appointment at a clinic and threatened staff causing them to call the police, who arrested and handcuffed him, sitting him down next to a patrol car. *Id.* at 967. Like in this case, the defendant-officers had reason to believe Johnson might flee: whereas Seelow was initially contacted because Schlender was running and tried to pull free from his grasp, Johnson told the defendant-officers he would run away. *Id*. When Johnson managed to stand, officers sat him back down. *Id*. Within about a minute, he stood again and started to move away. *Id.* Then an officer (Rogers) pulled Johnson backwards, and when that did not return him to the ground, Rogers tried another means resulting in a compound fracture of Johnson's leg. *Id.* At summary judgment, Johnson claimed that Rogers kicked him as punishment while Rogers contended that he used a leg sweep for control. *Id.* This Court found that the "grainy video" did not show clearly either way. *Id.*

Nonetheless, the video evidence in *Johnson* was sufficient to establish that the defendant-officer was entitled to qualified immunity. *Id.*, at 970. What resolved the appeal for Rogers was that Johnson, who posed a flight risk, "was *not* under control when Rogers tried to use his knee to unbalance [him]." *Id*. (emphasis original).

Similarly the video evidence in this case may not definitively show whether Schlender intentionally struck him with her heeled boot (i.e., kicked him) or even whether she contacted his shin inadvertently, <u>but</u> it firmly settles that Schlender was not under control.

The City Defendants do not dispute that the Slots Pit Camera depicts Schlender walking forward without incident. (R. 39, 8; SA 8). Neither do they deny that the video quality is such that the viewer cannot definitively say whether Schlender's heeled boot contacted Seelow's shin. Instead, the City Defendants argue—as in *Johnson*—that the portion of events that ***are*** clearly depicted are enough to determine the question of qualified immunity.

First, if the arrestee in *Johnson* posed a flight risk even though he was handcuffed behind his back then Seelow had comparatively greater reason to believe Schlender (who was not handcuffed) did so as well. Second, that Schlender walked for some time without incident demonstrates that she understood what Seelow intended—but stopped moving instead as they approached the column.

The district court found, the video appears to show that "Schlender turns her body and her body appears to sway or move just prior to the takedown." (R. 39, 18; SA 18). As discussed *supra*, the video clearly depicts more than that—yet that in and of itself is enough because even if Schlender did not subjectively intend to resist,

it was not objectively unreasonable for Seelow to interpret her conduct as such. *Dockery*, 911 F.3d at 463.

The district court held that "material factual disputes" precluded judgment based on qualified immunity at this stage. (R. 39, 19-20; SA 19-20). This Court reached a similar conclusion in *Gupta*. Comparing the available video evidence in each case illustrates that this case is more like *Johnson*, where the video depicted enough to resolve the question of qualified immunity, than *Gupta* where it did not.

Probable cause to arrest existed in *Johnson*, *Gupta*, and here. *See Johnson*, 944 F.3d at 967; *Gupta*, 19 F.4th at 1001; R. 39, 10-14; SA 10-14. Whereas the detainee was handcuffed in *Johnson* and *Gupta*, Schlender was not—instead, Seelow had taken the comparatively less restrictive option to physically lead her from the gaming floor. *See Johnson*, 944 F.3d at 967; *Gupta*, 19 F.4th at 1001; R. 39, 15; SA 15. Unlike in *Gupta*, where this Court found "no one was in the immediate vicinity" and "there was no immediate need to move [the plaintiff]," the district court held that Schlender was causing a disturbance and the video clearly depicts other patrons nearby. *Compare Gupta*, 19 F.4th at 1001, *with* Pit Walkway Camera, Slots Camera, and Slots Pit Camera. Finally, whereas the video in *Gupta* captured only the top of the plaintiff's head (including at the moment of alleged resistance) the video evidence in this case depicts Seelow and Schlender in full from multiple vantage points. *Compare Gupta*, 19 F.4th at 998, *with* Slots Pit Camera and Roulette Camera,

9:54:49-9:55:08. Moreover, as in *Smith* and *Johnson*, the video evaporates any genuine dispute that Schlender never tried to break free or was "lifted off [the ground]." In short, even if the video does not definitively capture the touching that caused Schlender to go down it ***does*** provide sufficient detail to answer the question of qualified immunity as in *Johnson* and *Brooks* and unlike *Smith* and *Gupta*.

## CONCLUSION

For the foregoing reasons, the district court's order denying summary judgment for Seelow based on qualified immunity should be reversed.

Dated and signed at Milwaukee, Wisconsin this 21st day of November, 2025.

<div style="margin-left: 50%;">

EVAN C. GOYKE
City Attorney

s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
WI State Bar No. 1131629

*Attorneys for Defendants-Appellees*

</div>

ADDRESS:
200 East Wells Street, Room 800
Milwaukee, WI 53202
Telephone: (414) 286-6192
Fax: (414) 286-8550
Email: cmuche@milwaukee.gov

# CERTIFICATION OF SERVICE

I hereby certify that on November 21st, 2025, I electronically filed the foregoing in searchable PDF format with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated and signed at Milwaukee, Wisconsin this 21st day of November, 2025.

s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney

ADDRESS:
200 East Wells Street, Room 800
Milwaukee, WI 53202
Telephone: (414) 286-6192
Fax: (414) 286-8550
Email: cmuche@milwaukee.gov

## CIRCUIT RULE 30(d) CERTIFICATE

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in the Required Short Appendix bound with the brief.

Dated and signed at Milwaukee, Wisconsin this 21st day of November, 2025.

s / Clint B. Muche
CLINT B. MUCHE

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limitation of Cir. R. 32(c) because it contains 9,057 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32(b) for a brief produced with a proportionally spaced font using the 2016 version of Microsoft Word in 14-point Times New Roman font.

Dated and signed at Milwaukee, Wisconsin this 21st day of November, 2025.

s / Clint B. Muche
CLINT B. MUCHE

No. 25-1671

---

**In the United States Court of Appeals**
**FOR THE SEVENTH CIRCUIT**

**CHARLES SEELOW and CITY OF MILWAUKEE,**
**DEFENDANTS-APPELLANTS**

**v.**

**ROXANNE SCHLENDER,**
**PLAINTIFF-APPELLEE**

---

Appeal from the United States District Court for the
Eastern District of Wisconsin, the Honorable
Nancy Joseph, United States Magistrate Judge, Presiding
Case No. 2:23-cv-0329,

---

**JOINT REQUIRED SHORT APPENDIX FOR ALL**
**DEFENDANTS-APPELLANTS**

---

EVAN GOYKE
City Attorney

Clint B. Muche
Assistant City Attorney for the City of Milwaukee
State Bar No. 1131629
Attorneys for Defendants-Appellees

Milwaukee City Attorney's Office
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8550

## Table of Contents

Description of Document                                                      Page

Order on Motion for Summary Judgment
(December 17, 2024) (R. 39) ..........................................................SA 1-23

Order on Motion for Reconsideration
(March 20, 2025) (R. 46) ..............................................................SA 24-29

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

ROXANNE SCHLENDER,

    **Plaintiff,**

    **v.**                            **Case No. 23-CV-329**

CHARLES SEELOW, et al.,

    **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

On March 13, 2017, Roxanne Schlender was injured during an encounter with Milwaukee Police Department Officer Charles Seelow at the Potawatomi Bingo Casino in Milwaukee, Wisconsin. Schlender sues Officer Seelow under 42 U.S.C. § 1983, alleging he unlawfully detained her and used excessive force against her in violation of her Fourth and Fourteenth Amendment rights. Schlender further seeks to hold the City of Milwaukee liable under state law through indemnification, and under federal law under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Defendants move for summary judgment in their favor on the grounds that Schlender's claims fail on the merits or alternatively, that Defendants are entitled to qualified immunity. (Docket # 26.) For the reasons further explained below, the Defendants' motion for summary judgment is granted in part and denied in part.

# FACTS

*1.      Background Facts*

Potawatomi Bingo Casino, a gaming and entertainment venue located at 1721 Canal Street, Milwaukee, Wisconsin, is operated by the Forest County Potawatomi Community, a federally recognized Indian Tribe. (Joint Statement of Undisputed Facts at Summary Judgment ("Undisputed Facts") ¶ 5, Docket # 24.) The City of Milwaukee and the Tribe have an agreement for Milwaukee Police Department ("MPD") officers to assist with security and law enforcement duties at the Casino. (*Id.* ¶ 6.) Pursuant to the Agreement, "[a]t all times and under all circumstances of this Agreement, MPD personnel shall remain under the sole command of MPD supervisors, and shall remain employees of the City of Milwaukee for all purposes whatsoever [;]" and "[t]he actions of the MPD personnel shall be governed by the policies and practices of the City and MPD as exercised in the discretion of the City and the Chief." (*Id.* ¶ 7.) The Casino also employs private security staff and maintains a private security department. (*Id.* ¶ 8.) The Casino has a network of overhead security cameras monitored by security staff. (*Id.* ¶ 10.) The parties have received seven surveillance videos from inside the Casino that depict events recorded on March 13, 2017. (*Id.* ¶ 11.)

*2.      The March 13, 2017 Incident*

### 2.1      Schlender's Arrival at the Casino

Roxanne Schlender was a patron at the Casino on March 13, 2017. (*Id.* ¶ 23.) Schlender testified that after leaving work that day, she had a meal with a friend where she consumed "maybe a half a glass of wine." (Second Declaration of Clint Muche ("Second Muche Decl.") ¶ 3, Ex. 1, Deposition of Roxanne Schlender ("Schlender Dep.") at 62–63,

2

68, Docket # 38-1.) Afterwards, Schlender drove herself to the Casino and arrived at approximately 7:00 p.m. (*Id.* at 63.) Schlender testified that after arriving at the Casino, she "had a couple drinks" and gambled. (*Id.* at 64.) Although she could not remember the exact number of drinks she had that night, she testified that she was drinking chardonnay and received her drinks from Bar 360, a bar in the Casino. (*Id.* at 64–65.) Schlender testified that she had surgery in late 2016 (*id.* at 55) and while she had prescription medication in her purse from her surgery, she had not taken any medication of any kind that day (*id.* at 65–66).

Schlender testified that while playing at the slots, she noticed a man looking at her. (*Id.* at 71.) She left the slots and went to the high stakes room, and then to the roulette. (*Id.*) Everywhere she went, she noticed the man in the vicinity. (*Id.*) Schlender testified that he was making her uncomfortable, so she went to the women's restroom. (*Id.* at 72.) Schlender wanted to stay in the bathroom for a while to give the man time to leave. (*Id.* at 75.) While in the bathroom, Schlender freshened up her makeup, looked at her phone, and went to the toilet. (*Id.*) Although it is unclear precisely how long Schlender remained in the bathroom, she testified that she was there "for some time waiting." (*Id.* at 76.)

### 2.2    Schlender's Removal from the Bathroom

The record contains the Casino's surveillance video footage beginning at 9:30:02 p.m. (Declaration of Clint Muche ("Muche Decl.") ¶ 3, Ex. A.) Around 9:30 p.m., Security Stand-in Supervisor Alex Traylor went to the North Women's Restroom near Bar 360 and spoke with Gary Heard, the food and beverage manager, about an intoxicated woman inside. (Undisputed Facts ¶ 26; Declaration of Clint Muche ("Muche Decl.") ¶ 4, Ex. B, Deposition of Alex Traylor ("Traylor Dep.") at 16–17, Docket # 29-2.) It was typical for bar

3

staff to alert security if they had concerns about a patron and Traylor testified that Heard informed him the intoxicated patron in the bathroom needed to be cut off. (Traylor Dep. at 17.) The video depicts Traylor speaking with Heard outside of the women's bathroom at approximately 9:36 p.m. (Ex. A at 9:36:17.) Traylor testified that because the patron was in the women's bathroom, he called for a female officer to come to the location. (Traylor Dep. at 17.) Security officers Jocelyn Mason and Nikki Martin responded to the North Restrooms to assist. (Undisputed Facts ¶ 27.)

The video shows Mason enter the bathroom about 30 seconds later. (Ex. A at 9:36:43; Muche Decl. ¶ 8, Ex. F, Deposition of Nikki Martin ("Martin Dep.") at 11, Docket # 29-6.) Mason remains in the bathroom for about one minute, and then exits at 9:37 p.m. and is seen speaking to Traylor, Heard, and a male security officer outside of the bathroom. (Ex. A at 9:37:47.) After speaking to the men for about a minute and a half, Mason goes back into the bathroom. (Ex. A at 9:39:02.) The male security officer exits the video frame at approximately 9:40 p.m. (Ex. A at 9:40:15) and returns about 30 seconds later with a wheelchair (Ex. A at 9:40:41). He wheels the wheelchair to the opening of the women's bathroom door; Martin arrives soon thereafter and enters the bathroom with the wheelchair. (Ex. A at 9:40:47.)

Martin testified that she was called to the North Restrooms to assist with an intoxicated person and when she arrived, Mason was already there. (Martin Dep. at 11.) After entering the bathroom, Martin testified that she found Schlender on the floor in the bathroom stall. (*Id.*) Martin testified that she tried to wake Schlender up and was eventually able to rouse her enough to assist getting her in the wheelchair. (*Id.* at 11–12.) Schlender,

4

however, testified that she was neither on the floor nor passed out at this time. (Schlender Dep. at 76.)

At approximately 9:43 p.m., Martin is seen poking her head outside the bathroom door and briefly speaking to Traylor, Heard, and another supervisor, Robert Mueller. (Ex. A at 9:43:06; Traylor Dep. 19, 28.) Martin reenters the bathroom a few seconds later. (Ex. A at 9:43:30.) Schlender testified that after she had been in the restroom for a while, the "next thing I know there's a wheelchair outside and the [casino staff] want me to have a seat in it" and leave the bathroom. (Schlender Dep. at 77.) The video shows Schlender being wheeled out of the bathroom in a wheelchair by Martin, with Mason walking behind, at approximately 9:46 p.m. (Ex. A at 9:46:55–9:46:59.)

### 2.3    Schlender's Time on Casino Floor After Leaving Bathroom

A few seconds later, Schlender gets up from the wheelchair. (Ex. A at 9:47:11.) She testified that she got up because she found it embarrassing to "sit there in the middle of the floor in a wheelchair." (Schlender Dep. at 77.) Schlender walks to the walkway next to the Casino floor and speaks with Mason, Martin, and Traylor. (Ex. A at 9:47:37.) She then sits down on a stool in front of a machine. (Ex. A at 9:47:52.)

The surveillance video lacks audio, and the parties contest the nature of the conversations that occurred next between Schlender and Casino staff. Schlender testified that she wanted to leave the Casino and informed the staff that she was leaving, that it was safe for her to leave, and that she planned to get an Uber or taxi to get home as she recognized it would be irresponsible to drive. (Schlender Dep. at 79–80, 83.) Whereas Traylor and Martin testified that Schlender was acting uncooperative, was slurring her words, and was refusing to leave the Casino. (Martin Dep. at 13, 14; Traylor Dep. at 18–

20.) Traylor testified that Schlender appeared intoxicated; he asked her for identification and saw "the poor motor skills of shuffling through them, going past her ID." (Traylor Dep. at 18.) Traylor further testified that at one point, Schlender indicated that she intended to drive home, and Traylor informed her that if she did, Casino staff would inform the MPD of her vehicle information and direction of travel. (Traylor Dep. at 21.)

The video depicts Schlender sitting on the chair in front of the machine for approximately two minutes. (Ex. A at 9:50:04–9:52:46.) During this time, Schlender is seen speaking with Casino staff, using her cell phone, and rummaging around in her purse. (*Id.*) The video appears to depict Schlender locating her identification and showing it to Traylor at approximately 9:51 p.m. (Ex. A.) Although she could not remember doing so (Schlender Dep. at 81), the video shows Schlender poking Traylor with her finger twice (Ex. A at 9:50:04; 9:52:21).

Schlender gets up from the chair in front of the machine at approximately 9:52 p.m. and begins walking with Traylor and other Casino staff members. (Ex. A at 9:52:45.) She then stops and proceeds to do a little dance, continues walking forward, and then resumes dancing. (Ex. A at 9:53:05–9:53:18.) Schlender testified that she remembers dancing and was trying to show the Casino staff that she was fine to leave. (Schlender Dep. at 82.) While Schlender continues walking forward with Casino staff for several more seconds, she then abruptly takes off running onto the Casino floor. (Ex. A at 9:53:34.) Schlender testified that she took off running because she "was done talking" and "wanted to leave." (Schlender Dep. at 83.) Traylor testified that at this point he contacted the on-site MPD officer (Traylor Dep. at 22) because he felt he was "losing control of the situation" and Schlender was refusing to leave (*id.* at 61).

6

## 2.4    Encounter with Officer Seelow

The parties contest the events immediately preceding Schlender's head injury. The video depicts Schlender crouching down, appearing to hide behind the machines. (Ex. A at 9:53:55.) A few seconds later, Schlender again begins running and encounters a uniformed MPD officer. (Ex. A at 9:53:57.) Officer Charles Seelow was the MPD officer working at the Casino that night. (Muche Decl. ¶ 13, Ex. K, Deposition of Charles Seelow ("Seelow Dep.") at 17, Docket # 29-11.) Officer Seelow testified that he heard a request over the Casino-issued radio for assistance and that Schlender appeared to be running away from security staff. (*Id.* at 17–18.) He testified that Schlender appeared highly intoxicated and because he did not know where she was supposed to be, he planned to escort her to the holding room. (*Id.* at 18.) Schlender testified that she could not remember her initial encounter with Officer Seelow; rather, after she took off "the next thing [she knew]" was that someone was "holding me from behind walking behind me down the long hallway." (Schlender Dep. at 84–85.)

The video shows that as Schlender approaches Officer Seelow, he raises his hand in a "stop" position. (Ex. A at 9:53:57.) Schlender walks past Officer Seelow's hand, and he precedes to put a hand on her back and grab her left arm. (Ex. A at 9:53:58.) For approximately the next minute, the video depicts Schlender trying to pull her arm free from his grasp and kick at him several times, dropping her phone in the process. (Ex. A at 9:53:58–9:54:31.) Martin hands Schlender's phone back to her, while Schlender continues trying to pull herself free. (*Id.*) Schlender briefly plants her feet on the floor while Officer Seelow attempts to pull her to walk forward. (*Id.*)

Officer Seelow testified that he grabbed Schlender "by just a normal escort hold for the . . . left arm, and the whole time she was like flailing and just really not coherent." (Seelow Dep. at 18.) Traylor testified that Schlender was verbally resisting Officer Seelow and pulling away from him. (Traylor Dep. at 65–66.) Martin testified that Schlender did not want to leave the Casino and Officer Seelow first grabbed a hold of her arm, but after she started trying to pull away from him, he changed the hold on her and started walking her toward the door. (Martin Dep. at 20.)

For the next 30 seconds or so, Schlender continues to move forward on the walkway, with Officer Seelow holding her left arm behind her back. (Ex. A at 9:54:31–9:55:02.) Schlender then turns away from Officer Seelow and walks backwards towards him. (Ex. A at 9:55:02.) Although the image is far from crystal clear, the camera view from the roulette table appears to depict a foot wearing a thick heeled shoe move backwards (Ex. A at 9:55:06:60–9:55:06:77) immediately before Schlender starts going down and hits her head on the cement pillar (*id.* at 9:55:09).

Schlender testified that Officer Seelow was holding her in a firm grip and as they neared the cement pillar, she looked over her shoulder and asked him to please let her go and that she would walk, but he grabbed her tighter and she lost her footing and went down. (Schlender Dep. at 88.) Schlender testified that Officer Seelow tugged her so hard that "[her] whole left side of [her] body kind of came off, lifted" and then he forcefully tried to push her down to the ground. (*Id.* at 88–89.) Schlender testified that she never tried to kick Officer Seelow or break free from his grip. (*Id.* at 86.)

Officer Seelow testified that after getting about "halfway to the room" Schlender "began to flail, flail her arms, wave her arms around . . . and then all of a sudden she mule-

kicked" him and struck his shin with her "big, thick high-heeled shoes." (Seelow Dep. at 23.) Officer Seelow testified that he was not sure if Schlender was trying to get away, so he used "the escort decentralization to escort her to the ground" and "en route or halfway to the ground she hit her head" on a pillar. (*Id.*) Traylor testifies that they were walking close to the concrete pillar and Schlender was "again resisting," and then she "lifted her foot up and kicked" Officer Seelow. (Traylor Dep. at 68.) He stated that Officer Seelow then took Schlender to the ground. (*Id.*) Martin similarly testified that Schlender was "trying to pull away from him and get away from his grip" just before Schlender went to the ground. (Martin Dep. at 21.)

Schlender sustained a 1-1 ½ inch laceration above her right eye. (Undisputed Facts ¶ 37.) She was initially taken to the First Floor First Aid room in the Casino via wheelchair and was subsequently transported to Mount Sinai Hospital via Bell Ambulance at approximately 10:50 p.m. (*Id.* ¶¶ 33–35.) Schlender's blood alcohol content as determined by Mount Sinai Hospital was 0.213. (*Id.* ¶ 36.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

9

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Once again, Schlender sues Officer Seelow under the Fourth Amendment and the City of Milwaukee under *Monell*. I will address each claim in turn.

*1.    Unlawful Seizure*

Schlender asserts that Officer Seelow violated her rights under the Fourth Amendment by detaining her without probable cause. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and

10

restrains his freedom to walk away, he has 'seized' that person."). Defendants do not dispute Schlender was seized by Officer Seelow. (Def.'s Br. at 9.) Thus, if someone is seized within the meaning of the Fourth Amendment, the next question is what type of seizure occurred. *Irvin v. Kaczmaryn*, 913 F. Supp. 1190, 1197 (N.D. Ill. 1996).

Whether probable cause or reasonable suspicion is needed to justify the seizure depends on the type of seizure that occurred. "Under the principles established in *Terry v. Ohio* and its progeny, even without probable cause, police may conduct an investigatory stop, limited in scope and executed through the least restrictive means reasonable." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot." *Id.* Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). However, a warrantless seizure beyond the bounds of a *Terry* stop is only constitutional if probable cause existed to justify it, regardless of whether the seizure was labeled an "arrest" by the officers. *Irvin*, 913 F. Supp. at 1197. "Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014). Although it requires something more than a hunch, "probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706,

11

714 (7th Cir. 2013). Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Id.*

Defendants argue that the evidence supports that Officer Seelow had probable cause to seize Schlender for disorderly conduct, or potentially for other crimes, including trespassing. (Def.'s Br. at 11.) Schlender argues that there is no evidence that she engaged in disorderly conduct under Wisconsin law. (Pl.'s Resp. Br. at 11, Docket # 34.) She argues that Wis. Stat. § 947.01 defines disorderly conduct as "whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance" and there is no evidence that she was engaging in such conduct. (*Id.*) She argues that Schlender "was running in a casino, and in Casino personnel's opinion, too drunk to drive. Neither rise to the level of misdemeanor disorderly conduct, especially when the event is put into perspective that it occurred at a gambling casino." (*Id.*)

But probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of evidence. *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003). Rather, probable cause exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the seizure would conclude that the person has committed, is committing, or is about to commit a crime." *Venson*, 749 F.3d at 649. The undisputed evidence supports that a reasonable person confronted with the totality of the facts known to Officer Seelow at the time of the seizure would conclude that Schlender was engaging in disorderly conduct.

To begin, the undisputed evidence supports that Schlender was highly intoxicated during her encounter with Officer Seelow. Schlender argues that Defendants "unfairly"

12

focus on her intoxication level "in an apparent attempt to sway the Court's opinion of her." (Pl.'s Resp. Br. at 4 n.2.) But her intoxication level is not a matter of moral judgment. Rather, it is one factor in the totality of the circumstances before Officer Seelow that supports a finding she engaged in disorderly conduct. Officer Seelow testified that upon encountering Schlender, she appeared highly intoxicated and incoherent. (Seelow Dep. at 16–17.) While Schlender testified that she did not know how intoxicated she was that night (Schlender Dep. at 82, 90), only that she "had a few drinks," (*id.* at 82), the record reflects Schlender's blood alcohol level over an hour after the encounter was 0.213. (Undisputed Facts ¶ 36.) As a point of comparison, the legal blood alcohol limit to drive in the state of Wisconsin is 0.08. *See* Wis. Stat. § 340.01(46m).

Furthermore, Schlender agrees that she was transported to Mount Sinai Hospital via ambulance at approximately 10:50 p.m. (Undisputed Facts ¶ 35.) Schlender's medical records show she arrived at the emergency department at 11:01 p.m. and describe her as "acutely intoxicated." (Muche Decl. ¶ 14, Ex. L, Docket # 29-12 at 2.)[1] Upon physical examination, the records state that Schlender had "alcohol on breath." (*Id.* at 8.) Upon neurological examination, it was noted that Schlender was disoriented to events, place, and situation and that she "does not know where she is or what happened prior to her arriving at the hospital." (*Id.* at 15.)

Officer Seelow also testified that he received word via the Casino-issued radio that Schlender was "running through the casino" and refusing to listen to security staff. (Seelow

---

[1] While Schlender challenges the admission of the Casino Incident Reports as inadmissible hearsay (Docket # 33 ¶ 38), she does not appear to object to the admission of her medical records on hearsay grounds. Fed. R. Evid. 803(4) provides that statements made for medical diagnosis or treatment are not excluded by the rule against hearsay so long as the statement is made for, and is reasonably pertinent to, medical diagnosis and treatment and describes medical history; past or present symptoms or sensations; their inception; or their general cause. The statements cited from Schlender's medical records fit comfortably within this hearsay exception.

Dep. at 16–17.) Just prior to encountering Officer Seelow, Schlender is seen on the surveillance video crouching down, appearing to hide behind the machines. (Ex. A at 9:53:55.) A few seconds later, Schlender begins running and encounters Officer Seelow. (Ex. A at 9:53:57.) Despite him raising his hand in a "stop" position, Schlender walks past him without stopping. (Ex. A at 9:53:57–9:53:58.) After grabbing her arm, Schlender begins kicking at Officer Seelow, yanking her arm from his grasp, and planting her feet on the ground so as not to move forward. (Ex. A at 9:53:58–9:54:19.)

Given the totality of the circumstances known to Officer Seelow at the time of the seizure—a highly intoxicated individual running through the Casino, refusing to listen to security staff, failing to stop running when instructed to by a police officer, and acting physically aggressive towards a police officer—a reasonable officer would conclude that Schlender was engaging in violent, boisterous, or "otherwise disorderly" conduct which tends to cause a disturbance. Thus, summary judgment is granted in favor of Officer Seelow as to Schlender's unlawful seizure claim.

2.    *Excessive Force*

Schlender further argues that Officer Seelow used excessive force in seizing her. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A police officer's use of force is unconstitutional, however, if "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (internal quotations and citations omitted).

14

Assessing the reasonableness of the force used to effect a particular seizure "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The reasonableness standard is objective, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).

Schlender argues that Officer Seelow used excessive force when he "escalated to pain compliance" while walking her down the Casino walkway and when he took her to the ground and she hit her head on the concrete pillar. (Pl.'s Resp. Br. at 12–13, 17.) The parties do not dispute that Officer Seelow held onto Schlender's arm as they walked and used a takedown maneuver with the intent of bringing her to the ground. The parties do dispute, however, the events preceding Schlender's injury.

Schlender testified that Officer Seelow was holding her in "a firm grip behind" as she walked with him. (Schlender Dep. at 87–88.) She testified that she looked over her shoulder a little bit to ask Officer Seelow if he could "please let [her] go" and promised that she would "just walk." (*Id.* at 88.) Schlender testified that Officer Seelow grabbed her arm tighter and "tugged [her] so hard that [her] whole left side of [her] body kind of came off, lifted." (*Id.*) Schlender stated that she fell because Officer Seelow "pulled [her] hard" and "forcefully tried to push [her] down . . . to the ground." (*Id.* at 88–89.) She testified that the next thing she remembered was waking up handcuffed in the hospital. (*Id.* at 89.) Schlender

denies ever kicking Officer Seelow or trying to break free from his grip at any point during their encounter. (*Id.* at 86, 96.)

Officer Seelow testified that he had Schlender's arm in a "normal escort hold" and that she was "flailing" and incoherent the entire time. (Seelow Dep. at 18.) He further testified that as he escorted Schlender off the Casino floor, at "some point when we got about halfway to the room" Schlender began to "flail her arms" and he was unsure "if she was trying to get away." (*Id.* at 22–23.) He testified that "all of a sudden" Schlender "mule-kicked" him in the shin and she was wearing "big, thick high-heeled shoes." (*Id.* at 23.) Officer Seelow testified that he then "had to use the escort decentralization to escort her to the ground" and "halfway to the ground she hit her head on that said pillar." (*Id.*) Officer Seelow sought medical treatment afterwards (*id.* at 24) and upon physical examination, the treating provider noted an approximately 0.25 cm area of skin abrasion on his left shin (Muche Decl. ¶ 15, Ex. M, Docket # 29-13 at 16).

Traylor was walking with Officer Seelow and Schlender and testified that he observed her pause, and "that's when another like resistance came and that's when she kicked him and he escorted her to the ground." (Traylor Dep. at 37.) Martin testified that she was walking behind Schlender and to Schlender's left and observed Schlender trying to pull away from Officer Seelow immediately before she went to the ground. (Martin Dep. at 21.)

The Casino's surveillance footage provides several views of the incident. Footage entitled "4902 Pit 8 Walkway PTZ" begins at approximately 9:53:52 p.m. and depicts Schlender crouching behind slot machines and then running forward, encountering Officer Seelow at approximately 9:53:57 p.m. Officer Seelow appears to raise his hand in a "stop"

16

motion and Schlender runs past him. (Ex. A at 9:53:58–9:53:59.) Officer Seelow immediately grabs Schlender's left arm. (Ex. A at 9:53:59.) For the next second, the video depicts Schlender kicking at Officer Seelow; however, it does not appear that any of these kicks contact Officer Seelow's body. (Ex. A at 9:54:02–9:54:08.) Schlender briefly attempts to pull her arm from Officer Seelow's grip immediately prior to making the kicking motions. (Ex. A at 9:54:00–9:54:02.) After Martin hands her back her dropped phone, she plants her feet on the floor while Officer Seelow appears to pull her arm. (Ex. A at 9:54:13–9:54:23.) By 9:54:23 p.m., the video shows Officer Seelow holding onto Schlender's left arm and proceeding to escort her down the walkway until they go out of view at approximately 9:54:50 p.m.

The footage entitled "TT Slots Pit 8 PTZ" depicts Schlender turning her body away from Officer Seelow at approximately 9:55:02. Schlender appears to walk backwards towards Officer Seelow (Ex. A at 9:55:02–9:55:04) before turning again to face forward (Ex. A at 9:55:05). Schlender appears to begin moving backwards again and then staggers forwards at approximately 9:55:06, immediately before she goes down to the floor, hitting her head on the pillar, at approximately 9:55:08. The footage entitled "TT13-14-15-16" is a far more distant view. However, at 9:55:02, Schlender can be seen moving backwards towards Officer Seelow before going to the floor at approximately 9:55:06–9:55:08. The video camera set up behind the roulette table gives a front view of the pillar on which Schlender hits her head. The video appears to depict a heeled shoe move backwards at approximately 9:55:06 before Schlender falls to the ground at 9:55:08. The video entitled "4703 TT PTZ" provides a front view of the pillar from overhead. The footage shows

17

Schlender's body swaying at approximately 9:55:06 and Officer Seelow taking her to the ground towards the pillar at 9:55:08.

Defendants argue that Officer Seelow's use of force was reasonable and proportional as a matter of law, stating that the "video evidence clearly and unmistakably shows" that Schlender was resisting Officer Seelow's efforts to control her. (Docket # 37 at 14.) It is true that when video footage "firmly settles a factual issue," then "there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). However, the court of appeals has also recognized that videos "are sometimes unclear, incomplete, and fairly open to varying interpretations." *Id.*

Defendants overstate how "clearly and unmistakably" the video footage corroborates Officer Seelow's version of events. In the initial, less-than-a-second timeframe when Schlender first encounters Officer Seelow, the video fairly depicts her trying to pull her arm from his grip and make kicking motions at him. However, after the two begin walking down the pathway through the Casino, and immediately prior to Officer Seelow implementing the takedown maneuver, the video is both unclear and fairly open to varying interpretations. While in the video it appears Schlender turns her body and her body appears to sway or move just prior to the takedown, Schlender testified that she looked over her shoulder to ask Officer Seelow to please let her go, assuring that she would walk on her own. She denies kicking him prior to the takedown. Whereas Officer Seelow testified that Schlender began to flail her arms around as they preceded down the pathway and then "mule-kicked" him in the shin. Again, while the video footage appears to show a heeled foot move backwards, the vantage point is not clear.

SA 018

Thus, this is not a case where the video footage "firmly settles a factual issue." *See Horton*, 883 F.3d at 944. Although the surveillance video captures some of the interaction, it does not fully corroborate either party's version of events. Taking the facts in the light most favorable to Schlender, as I must on summary judgment, a reasonable factfinder could conclude that Officer Seelow employed more force than was justified under the circumstances. Again, Schlender testified that she was trying to leave the Casino and was cooperating with Officer Seelow. She denies physically resisting the escort from the Casino. Further, Officer Seelow was not alone with Schlender, the video confirms he was accompanied by multiple Casino employees. Thus, a reasonable jury could conclude, based on the totality of the circumstances, that the takedown maneuver was excessive. For these reasons, Defendants' motion for summary judgment as to the excessive force claim is denied.

### 3. Qualified Immunity

Defendants argue that summary judgment in favor of Officer Seelow is warranted based on the doctrine of qualified immunity. "Qualified immunity serves to protect those public officials who have violated a constitutional right when the contours of that right were not sufficiently clear at the time to enable a reasonable official to know that his conduct was prohibited." *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 687 (7th Cir. 2007). It is clearly established that a police officer may not use excessive force in arresting an individual, *id.*, especially if the individual is not actively resisting, *see Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021) (stating that "significant force is unreasonable after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest"); *Miller v.*

*Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest.").

The existence of material factual disputes about the circumstances surrounding Officer Seelow's takedown maneuver precludes a ruling on qualified immunity at this juncture. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018). This does not mean, however, that qualified immunity is no longer available as a defense at trial. *See id.* Rather, at trial, a jury may resolve these disputed facts, and the Court will then determine whether Officer Seelow is entitled to qualified immunity as a matter of law. *See id.* Thus, Defendants' motion for summary judgment as to qualified immunity is denied.

### 4. Monell *Claim Against the City*

Schlender brings a claim under *Monell* against the City of Milwaukee, alleging that a policy, practice, or custom of the City deprived Schlender of her constitutional rights, and that the City failed to train and supervise its employees. (Compl., Count II.) Under *Monell*, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents under a theory of *respondeat superior*; rather, it is when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694. Under certain circumstances, a municipality's failure to train its officers can amount to a municipal policy and form the basis for liability under § 1983. *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1013 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015). The *Brown* court found that:

A municipality will be held liable under a failure-to-train theory only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact. This may arise in either of two circumstances. First, a municipality acts with deliberate indifference when, in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the deficiency exhibits deliberate indifference on the part of municipal policymakers. Alternatively, a court may find deliberate indifference when a repeated pattern of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers. Besides showing that the failure to train constitutes deliberate indifference, the plaintiff must demonstrate a causal connection between the inadequate training and his or her injury.

*Id.* at 1013–14 (internal quotations and citations omitted). Despite the City moving for summary judgment on this claim, Schlender fails to provide evidence in support of her *Monell* claim, nor does her brief address any of the City's arguments. Even as the nonmovant, as the party with the ultimate burden of proof at trial, Schlender retains the burden of producing evidence which would support a reasonable jury verdict. *See Celotex Corp.*, 477 U.S. at 324. She fails to do so. For these reasons, summary judgment is granted in favor of Defendants on Schlender's *Monell* claim against the City.

> 5.    *Summary of Remaining Claims*

In addition to her unlawful detention and excessive force claims against Officer Seelow and her *Monell* and state law indemnification claims against the City of Milwaukee, Schlender also sued Officer Seelow under the Fifth Amendment, alleging he violated her rights by fabricating evidence against her and under state law negligence; former Milwaukee Police Chief Edward Flynn under *Monell*; and the City under *respondeat superior*. (Compl., Docket # 1.) On August 7, 2024, the parties stipulated to dismiss the Fifth Amendment and negligence claims against Officer Seelow (Docket # 23, ¶¶ 1, 3); the *Monell* claim against

Chief Flynn (id. ¶ 2); and the *respondeat superior* claim against the City (id. ¶ 4). The City also stipulated, however, that "if and only if the finder of fact in this case finds that any City employee violated Plaintiff's constitutional rights as alleged in her Complaint," that judgment may be entered against the City for compensatory damages. (*Id.*, ¶ 9.) In other words, the City agrees that it will indemnify Officer Seelow if there is a legal finding that he violated Schlender's constitutional rights as alleged.

With summary judgment granted in Defendants' favor on Schlender's unlawful seizure claim against Officer Seelow and her *Monell* claim against the City, as well as the parties' stipulation of partial dismissal, Schlender may proceed to trial on her excessive force claim against Officer Seelow.

## CONCLUSION

Schlender seeks to hold Officer Seelow liable for her injuries stemming from his alleged Fourth Amendment violations. She further sues the City of Milwaukee under *Monell*. While I find a dispute of material fact remains as to Schlender's excessive force claim against Officer Seelow, I find that summary judgment in favor of Defendants is warranted on Schlender's unlawful seizure and *Monell* claims. Thus, the unlawful seizure and *Monell* claims are dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion for Summary Judgment (Docket # 26) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's excessive force claim will proceed. Plaintiff's unlawful seizure and *Monell* claims are dismissed. The Clerk's Office will contact the parties regarding scheduling this case for trial.

22

**IT IS FURTHER ORDERED** that pursuant to the parties' stipulation for partial dismissal, Plaintiff's Count I Fifth Amendment claim against Officer Seelow is dismissed. Plaintiff's Count II cause of action against Edward Flynn is dismissed and Edward Flynn is dismissed as a party to this action. Plaintiff's Count IV claim for significant bodily harm under state law is dismissed. And Plaintiff's Count V alleging state law *respondeat superior* is dismissed subject to the parties' stipulation regarding indemnity.

Dated at Milwaukee, Wisconsin this 17th day of December, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ROXANNE SCHLENDER,

    Plaintiff,

    v.                                Case No. 23-CV-329

CHARLES SEELOW, et al.,

    Defendants.

---

## DECISION AND ORDER ON DEFENDANTS'
## MOTION FOR RECONSIDERATION

---

Roxanne Schlender sued Milwaukee Police Department Officer Charles Seelow and the City of Milwaukee under 42 U.S.C. § 1983 for injuries she incurred during an encounter with Officer Seelow on March 13, 2017, at the Potawatomi Bingo Casino in Milwaukee, Wisconsin. Defendants moved for summary judgment in their favor on the grounds that Schlender's claims failed on the merits or alternatively, that Defendants were entitled to qualified immunity. In a decision issued December 17, 2024, I granted in part and denied in part Defendants' motion. (Docket # 39.) Schlender was permitted to proceed to trial on her excessive force claim against Officer Seelow; however, judgment was entered in favor of Defendants on Schlender's unlawful seizure and *Monell* claims.[1] Defendants' motion for summary judgment based on qualified immunity was denied.

---

[1] Although Schlender's claim against the City of Milwaukee pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) was dismissed, the City remains a party to this case based on the City's agreement that if the fact finder determines Officer Seelow violated Schlender's constitutional rights as alleged and awards compensatory damages, judgment will be entered against the City rather than against Officer Seelow. (Docket # 23.)

Defendants now move for reconsideration of the qualified immunity decision pursuant to Fed. R. Civ. P. 59(e). (Docket # 42.) For the reasons explained below, Defendants' motion is denied.

## LEGAL STANDARD

Rule 59(e) allows a party to move the court for reconsideration of a judgment within 28 days following the entry of the judgment. Although no judgment has yet been entered in this case, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

A motion for reconsideration serves a very limited purpose in federal civil litigation; it should be used only "to correct manifest errors of law or fact or to present newly discovered evidence." *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656 (N.D. Ill. 1982), *aff'd* 736 F.2d 388 (7th Cir. 1984)). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)). Apart from manifest errors of law, "reconsideration is not for rehashing previously rejected arguments." *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Whether to grant a motion for reconsideration "is left to the discretion of the district court." *Id.*

2

## ANALYSIS

Defendants argue that the Court's failure to grant summary judgment in their favor based on qualified immunity constitutes a manifest error of law. They argue that under controlling legal precedent, qualified immunity protects reasonable mistakes about the necessity and amount of force used. (Docket # 43 at 7.) Defendants argue that the "overwhelming weight of existing case law has held that decentralizing a non-compliant suspect is *not* excessive force." (*Id.*) (emphasis in original.) They argue that even if the video evidence in this case does not conclusively demonstrate what happened, it shows that Schlender resisted Officer Seelow's efforts to control her "at several points, including immediately prior to the takedown." (*Id.* at 8.)

Defendants fail to show a manifest error of law. The court's decision in *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021) is instructive here. Plaintiff Smith left the scene of a fight and returned with a gun. *Id.* at 729. After a citizen complained, two Milwaukee police officers on patrol came upon Smith and saw he matched dispatch's description of the suspect. *Id.* When the officer approached him, Smith fled. *Id.* The officers followed, believing Smith was armed. *Id.* Smith was found hiding on a rooftop one block away and when the officers found him, a standoff occurred. *Id.* After Smith refused numerous orders to cooperate, two additional officers (the defendants in the case), approached Smith and drew their weapons, believing Smith was armed. *Id.* The parties dispute what happened next—the officers thought Smith was reaching down behind an air conditioning unit for a gun, and Smith contended he was responding to an earlier command to get down on the ground. *Id.* Officers shot Smith three times, seriously injuring him. *Id.*

3

Smith sued under § 1983, alleging excessive force. The officers moved for summary judgment, arguing that their use of force was reasonable as a matter of law and that qualified immunity shielded them from liability. *Id.* The district court denied the officers' motion and the officers filed an interlocutory appeal of the denial of qualified immunity. *Id.* The court of appeals affirmed the district court's denial of qualified immunity. In so doing, the court noted that many of the undisputed facts of the case would justify the use of deadly force under *Graham v. Connor*, 490 U.S. 386 (1989), including the fact that Smith was suspected of returning to the scene of a fight with a gun and failed to obey numerous commands from different officers, resulting in a two-minute standoff in a public location bounded by occupied buildings. *Id.* at 739. But despite these facts, the court found that it must consider the totality of the circumstances, including the period just before and during the incident. *Id.*

And in this case, two facts critical to a reasonable officer's perspective were disputed—how Smith moved to the ground before and as he was shot and whether Smith presented an immediate threat to the officers. *Id.* Again, the officers believed Smith was reaching for a gun, while Smith stated that he was surrendering. *Id.* at 740. The court found that "[e]ach interpretation goes to the qualified immunity question." *Id.* The court noted that an individual "surrendering to officers" is a reduced threat and is putting up less resistance; thus, to "a reasonable officer in these circumstances, whether Smith continued to present a threat, how immediate that threat was, and whether Smith continued to resist and how much, are uncertainties and unresolved material questions of fact." *Id.* at 741. As such, the court concluded that "[b]efore the officers' legal argument for qualified immunity can be decided, these factual disputes as to how much of a threat Smith posed and how actively he was resisting must be resolved." *Id.* at 742.

4

Similar here, and as I previously found in the decision denying summary judgment as to qualified immunity, although the surveillance footage captures some of the parties' interactions, it does not fully corroborate either party's version of events. On reconsideration, Defendants again argue that the video shows Schlender resisting Officer Seelow at several points during the encounter. I already considered this evidence, finding that "[i]n the initial, less-than-a-second timeframe when Schlender first encounters Officer Seelow, the video fairly depicts her trying to pull her arm from his grip and make kicking motions at him." (Docket # 39 at 18.) I further found, however, that "after the two begin walking down the pathway through the Casino, and immediately prior to Officer Seelow implementing the takedown maneuver, the video is both unclear and fairly open to varying interpretations." (*Id.*) Again, Schlender contends that she turned her body to look over her shoulder to ask Officer Seelow to let her go, assuring him that she would walk on her own; whereas Officer Seelow contends that Schlender began to flail her arms around as they preceded down the pathway and then "mule-kicked" him in the shin. (*Id.*)

Thus, as in *Smith*, even assuming Schlender initially resisted, the circumstances just prior and during the incident are also relevant, and Schlender contends that just prior to Officer Seelow taking her to the ground, she was cooperating with him. Nothing in the video footage conclusively confirms or dispels Schlender's version of events. These factual issues are central to whether a reasonable officer would conclude that Schlender was actively resisting, justifying the takedown maneuver. In other words, as I previously found, the "existence of material factual disputes about the circumstances surrounding Officer Seelow's takedown maneuver precludes a ruling on qualified immunity at this juncture." (Docket # 39 at 20.) Defendants have failed to show reconsideration is warranted under Rule 59(e).

**CONCLUSION**

Reconsideration under Rule 59(e) serves the very limited purpose of correcting manifest errors of law or fact. While Defendants disagree with the Court's summary judgment ruling regarding qualified immunity, disagreement with the Court's analysis does not constitute a manifest error of law. There must be a wholesale disregard, misapplication, or failure to recognize controlling precedent. Defendants cannot meet that standard in this case. For these reasons, Defendants' motion for reconsideration is denied.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendants' motion for reconsideration (Docket # 42) is **DENIED**.

Dated at Milwaukee, Wisconsin this 20th day of March, 2025.

BY THE COURT:

_____

NANCY JOSEPH
United States Magistrate Judge